IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :
                                             :
CATALENT PHARMA SOLUTIONS, LLC   :   Case No. 1:25-cv-02394
                                             :
              Plaintiff,                     :   Hon. Matthew J. Maddox
                                             :
     v.                                      :
                                             :
BEN WOODARD,                                 :
                                             :
              Defendant.                     :
                                             :
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**DECLARATION OF MAXINE FRITZ**

I, Maxine Fritz, do hereby state as follows:

1. My name is Maxine Fritz. I am an independent consultant for HealthCare Innovation Catalysts. I am familiar with the facts set forth herein. I have been retained by Catalent Pharma Solutions, LLC as an expert in the above-captioned matter.

2. I have 30+ years of combined experience with the U.S. Food and Drug Administration (FDA) as well as industry management experience. (*See* Exhibit A, CV for M. Fritz). At the FDA, I was an investigator specializing in biological and pharmaceuticals. I have experience in areas such as quality assurance, senior management, validation, vendor qualification, internal and external audits, batch record review, product release, investigation of non-conformances and deviations, Current Good Manufacturing Process (cGMP) training, and aseptic manufacturing. My experience with FDA, in industry, and consulting, provide a combination of experience that qualify me as an expert in cGMPs as well as regulatory requirements regarding pharmaceutical manufacturing.

3. As a consultant, I have previously managed a team supporting cGMP supplier audits for Catalent. I have also consulted for some companies that I know to be Catalent's clients. None of my prior work related to Catalent or companies that are clients of Catalent pertains to the issues or Catalent site related to this litigation.

4. To ensure the quality of human pharmaceuticals and protect the safety of consumers, the FDA enforces cGMPs as the main regulatory standard. cGMPs are designed to assure the strength, quality, identity, and purity of drug products through control of manufacturing operations. I have performed hundreds of inspections and audits of manufacturing facilities to ensure that they are meeting cGMP requirements.

5. cGMPs apply to all steps of pharmaceutical design and manufacture to ensure a highly controlled process that results in safe and effective drug products. The Code of Federal Regulations (CFR) Title 21 Part 211 describes cGMPs for Finished Pharmaceuticals.

6. The FDA is authorized to perform inspections under the Federal Food, Drug, and Cosmetic Act, Section 704 (21 U.S.C. § 374). FDA Form 483, "Inspectional Observations," is a form used by FDA investigators to document and communicate concerns discovered during these inspections.

7. I am familiar with the process of drafting and issuing FDA Form 483s as part of the FDA inspection process. I have written and reviewed hundreds of inspectional observations on Form 483s.

8. A FDA Form 483 observation, by itself, does not mean that a manufacturing facility is not compliant with regulatory requirements or that the products manufactured at the facility are unsafe or ineffective. Observations are often found upon FDA inspection that can be remedied through correction (actions taken by companies during FDA inspections) and corrective action

2

(actions taken by companies after FDA inspections), and no additional regulatory action is required.

9. The FDA is required to present any observations found during inspection, even the most minor, to the company's management to ensure that any deficiencies are corrected. This process of continuous improvement is integral to the cGMP regulations and is part of what is called a "quality system" that governs the integrity of pharmaceutical manufacturing.

10. In my experience, many companies received observations on FDA Form 483s and went on to immediately remediate the observations with no further FDA action and no adverse consequences on products or patients.

11. I have reviewed the documents taken by Mr. Woodard listed in ECF Nos. 31-1, 31-2 and in which he asserts there is evidence of non-compliance at the Harmans, Maryland Catalent facility. In my review, I have identified no evidence of cGMP shortfalls that would rise to a level of concern that the products produced at the Catalent facility are not safe, pure, and potent (the standard for approval of biological products). Instead, these documents appear to be part of the routine discussion and remediation one would expect in quality systems, which are ever evolving. Companies are expected to continuously assess and—where warranted—improve their practices, and regulators recognize that these types of discussions and concerns are managed within the company's quality system. cGMP shortfalls are not uncommon, even at the best run facilities.

12. In my opinion:

    a. Mr. Woodard is overstating the significance of these documents as it relates to the compliance of Catalent's quality system. The documents do not indicate that the Catalent facility was trying to cover up any manufacturing

deficiencies. Instead, it is clear that Catalent was addressing issues identified in the ordinary course of business as part of its quality system.

b. The information in these documents is the confidential and proprietary nature of Catalent and its clients. The manufacturing process for pharmaceuticals is a highly technical, heavily guarded process that most companies would not want revealed. Should the content of these documents be disclosed to competitors, they could be worth millions of dollars in intellectual property damage.

c. For example, Mr. Woodard took many documents related to Catalent's overall quality and manufacturing processes. The details of Catalent's quality and manufacturing processes contained in these documents could be considered trade secrets. Catalent holds itself out as an expert contract manufacturer in the pharmaceutical space. One of the things that differentiates Catalent in the industry is its quality system and ability to manufacture some of the most difficult-to-make products. Competitors would likely want to know the elements of Catalent's quality system to be able to improve their own processes to better compete against Catalent to make these more technically challenging products.

d. Mr. Woodard also took documents containing his opinions of the quality of Catalent's pump calibration. The characterizations and descriptions of Catalent's practices in these documents set forth only Mr. Woodard's flawed opinions and, especially without context, do not reflect regulatory expectations. Mr. Woodard's characterizations in these documents could also

    be damaging to Catalent as they reflect opinions regarding regulatory non-compliance that are not supported by the facts.  Additionally, Catalent underwent an FDA inspection in April 2025, where pump calibration was an observation noted in the FDA Form 483 received after the inspection.  Catalent submitted a response to the FDA in May 2025 detailing how it is remediating the pump calibration observation.  Because the FDA had already been notified of the pump calibration concern and Catalent had taken appropriate remedial action before the date that Mr. Woodard allegedly took Catalent documents, it is not clear what more Mr. Woodard expected Catalent to do.  Catalent responded appropriately to the FDA to an ordinary concern, and this issue is unlikely to result in enforcement action by the FDA.  Catalent's remediation described in the May 2025 response is likely to be found adequate by the FDA.

  e. After reviewing the documents and filings containing Mr. Woodard's concerns, Mr. Woodard has only a cursory understanding of cGMPs and how a quality system works.  Mr. Woodard obviously does not fully understand the regulatory requirements and therefore is not applying them appropriately before creating an exaggerated concern.

  13. Mr. Woodard cites various sections of the CFR in his Supplemental Brief (ECF No. 35), that I have reviewed and found to be irrelevant to the proceedings.  For example, the compliance regulation Mr. Woodard cited with respect to one of his concerns is 21 CFR § 820.72. This regulation is not relevant to pharmaceutical manufacturing, as it is part of the CFR that is intended for medical devices.  Mr. Woodard also cites in his Supplemental Brief 21 C.F.R. § 58.63.

This regulation is not pertinent to cGMPs and would not be applicable because it relates to animal testing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __14____ day of August 2025.

_____
Maxine K. Fritz